# CHARLESTON

KEY *v.* HUGHES'S EX'RS.

·*(GREEN, JUDGE, absent.)

Submitted January 18, 1889.—Decided February 16, 1889.

1. TRUSTS AND TRUSTEES.

A trustee acting strictly within the line of his duty and exercising reasonable care and diligence will not be held responsible for the loss or depreciation of the trust-fund or the insolvency or misconduct of any person, who may have possessed it; but if that line of duty be not strictly pursued, and any part of the fund be invested upon securities not authorized or be put within the control of persons, who ought not to be intrusted with it, when there is no necessity for so doing, and a loss be thereby eventually sustained, such trustee will be liable to make it good however unexpected the result, however little likely to arise from the course adopted, and however free such conduct may have been from any improper motive. (p. 188.)

2. TRUSTS AND TRUSTEES—EXECUTOR.

An executor is directed by will to invest a specified sum of money in interest-bearing bonds and pay the interest thereon to a legatee for life and after her death to divide the fund among her children. The executor applied to the cashier of a bank, who agreed to sell him United States bonds, but without seeing the bonds or knowing, that they were in the bank, the executor paid the cashier for them with the understanding, that they were to be held by the bank subject to his order. No bonds were in fact ever put in the bank on special deposit in the name of the executor or as his property, but the cashier paid to him, as the interest matured on such bonds, a sum equal to their interest. No inquiry was made by the executor for the bonds until after the failure of the bank nearly two years thereafter, when it was ascertained, that there were no bonds there; and if such bonds had ever been deposited there, they had been appropriated by the cashier long before the failure of the bank. *Held.*—The executor is liable for the trust-fund. (p. 191.)

3. TRUSTS AND TRUSTEES.

Where the relation of parties is that of trustee and *cestui que trust*, the statute of limitations does not commence to run, until there has been an open denial and repudiation of the trust by the trustee brought home to the *cestui que trust* in such a manner as will require the latter to act as upon an asserted adverse title. (p. 192.)

---

*On account of illness.

*H. M. Russell* for appellants.

*J. R. Holt* for appellees.

SNYDER, PRESIDENT:

Appeal from the decrees of the Circuit Court of Ohio county, pronounced in a suit brought September 11, 1886, by Mary Key and her children against the executors of Thomas Hughes deceased. The plaintiffs' bill avers, that Mary Leech late of the city of Wheeling by her last will directed her executor, the said Thomas Hughes, to set apart $5,000.00 of her estate and invest the same in interest-bearing bonds and pay the interest or dividends derived therefrom to Mary Key during her life, and at her death to divide the principal equally among the children of said Mary; that said Hughes on July 13, 1868, duly qualified as such executor, set apart said $5,000.00, and after paying the United States succession tax there remained in his hands as a trust-fund for the plaintiffs $4,807.76, which he in July, 1869, invested in United States bonds of the par value of $4,500.00 the premium thereon being at that time $307.76; that from time to time the executor paid to the plaintiff, Mary Key, the interest on said bonds, but since the year 1873 she has never received any statement of account from the executor, nor has he made any settlement before any commissioner or court, showing such account; that he claimed to have deposited said bonds for safe-keeping in the Wheeling Savings Institution, a bank doing business in the city of Wheeling up to about the month of February, 1871, when it became insolvent and ceased to do business; that the executor claimed that by the failure of said bank the said bonds had been wholly lost, but that this claim was not made until April, 1873, more than two years after the alleged loss; that the plaintiffs have no information other than the mere statement of the executor, whether or not said bonds were in fact ever deposited in said bank, and they insist, that until it is shown, that said bonds were lost without the fault of the executor, his estate is liable therefor; that in April, 1873, said executor represented, that he had procured from the treasurer of said bank some scurities, from which something might be

realized, and that he would advise the plaintiff, Mary Key, as to the facts, but he wholly failed to do so; that notwithstanding the claim of the executor, that said fund had been lost, he has from year to year paid to the plaintiff, Mary Key, at various irregular times sums of money on account of said trust-fund, his last payment having been made in November, 1885; that in March, 1886, the said executor died testate, and the defendants on March 19, 1886, duly qualified as his executors. The prayer of the bill is, that the estate of said Thomas Hughes, executor as aforesaid, may be held liable for said trust-fund; that a trustee may be appointed to hold and invest and dispose of said fund, as directed by the will of said Mary C. Leech; and for general relief.

The defendants answered the bill admitting, that the trust-fund came into the hands of their testator as executor of Mrs. Leech in the manner stated in the bill; and averring that said fund had been invested in United States bonds of the issue known as "ten-forties," and said bonds were deposited in the Wheeling Savings Institution, a bank of good repute and financial standing, and that they had been feloniously abstracted therefrom by A. C. Quarrier, the treasurer of said bank, without the knowledge or authority of said Hughes, and wholly lost without the fault of said Hughes, and in such manner as to relieve his estate from any liability therefor. The defendants also plead the statute of limitations and claim, that the laches of the plaintiffs in the assertion of their alleged demand have been such as to forbid any relief in this case.

The cause was finally heard on June 2, 1888, on the depositions filed, the report of a commissioner and the exceptions thereto; and the court held and decreed, that the estate of Thomas Hughes, deceased, was chargeable with the principal sum of $4,500.00 and $316.57 accrued and unpaid interest thereon and appointed James P. Rogers, trustee, to collect and administer said sums according to the will of the said Mary C. Leech. The defendants obtained this appeal.

The important inquiry is: Are the facts and circumstances appearing in this cause of such a character as to relieve the trustee, Thomas Hughes, and his estate from lia-

bility for the loss of said trust-fund? The record shows, that said Hughes prior to July, 1869, deposited the whole trust-fund, $4,807.76, to his credit as executor in the Wheeling Savings Institution, a bank of good credit and reputation in the city of Wheeling, of which A. C. Quarrier, a man of good reputation and business qualifications, was then the treasurer or cashier. On July 10, 1869, the executor drew his check in these words: "Pay to ——— 10-40 bonds, $4,500.00, or bearer, forty eight hundred and seven 76-100 dollars,"—and passed it to said A. C. Quarrier, who in his deposition says: "To the best of my recollection Mr. Hughes informed me, that he wished to purchase as executor forty five hundred dollars in United States ten-forty bonds and desired me to procure them for him. I thereupon agreed to sell him the bonds at the then existing market-price, and I did then and there deliver to him a bill of sale for said bonds, and received from him in payment thereof his check for $4,807.76, it being understood by Mr. Hughes at the time, that the bonds were in New York city to the credit of the Wheeling Savings Institution."

Quarrier further says, that this transaction occurred at the banking-house of said savings institution, and that the said bonds were to remain under the control of said savings institution subject to the order of Mr. Hughes as executor; that Mr. Hughes never until after the failure of said bank asked for or received any such bonds from said bank; that on one occasion the interest was paid to Mr. Hughes in coupons of ten-forty bonds; and whether the witness detached them from bonds then in the bank or he bought them, he does not remember, and on all other occasions the said bank paid to him the value of the interest-coupons in money. This witness further says, that the probabilities are, that he did not have the bonds in the bank, as he was awaiting Mr. Hughes's demand for them to give the order to purchase them in New York, it being understood that they were to be held subject to his demand or order; but no demand was ever made for them, nor was Mr. Hughes ever informed that the bonds had been purchased.

After the failure of the said bank its books showed, that under date of July 10, 1869, the sum of $4,874.76 had been

credited to the American Exchange National Bank of New York on account of bonds purchased for said Savings Bank, and on November 2, 1869, the said New York bank is charged with $4,845.45 on account of 10-40 bonds sold to it by said Savings Bank. Soon after its failure the said Savings Bank made an assignment of all its assets to D. Lamb, trustee, for the benefit of all its creditors without preference. Its indebtedness, principally to depositors, amounted to about $350,000.00 and its assets realized less than $100,000.00. It was indebted to Hughes over $2,000.00 on account of deposits, in addition to his aforesaid claim as executor. Mr. Lamb, the trustee, in April, 1871, issued to Hughes certificates for the amount found by the books of the bank to be due him in his own right, and on March 30, 1872, he issued a certificate to Hughes in these words: "This certifies that upon adjustment there is due to Thomas Hughes forty-eight hundred and forty-five dollars, upon certif. No. 2,556, $1,000.00 and U. S. ten-forties, misappropriated by treasurer, $4,845.45, entitled to such dividends as may be made from the assets of the institution." The books of the bank show that certificate No. 2,556, above mentioned, was given to Hughes by Quarrier, cashier, on February 15, 1871, for a deposit of $3,000.00 with a credit for $2,000.00 indorsed thereon, leaving $1,000.00 due on the certificate. This would seem to indicate, that only $3,545.00 in United States 10-40 bonds had been misappropriated by Quarrier.

These are all the material facts appearing in the record in respect to the management and loss of the said trust-fund; and the question presented is: Do they show such care and diligence on the part of the executor or trustee as to relieve him from liability for its loss?

The law is stated in 2 Lomax, Ex. 482, (293,) as follows: "The result of the best authorities on this subject was thus stated by Lord Cottenham: 'Although a personal representative acting strictly within the line of his duty and exercising reasonable care and diligence will not be responsible for the failure or depreciation of the fund, in which any part of the estate may be invested, or for the insolvency or misconduct of any person, who may have possessed it, yet, if that line of duty be not strictly pursued, and any part of the property

be invested by such personal representative in funds or upon securities not authorized or be put within the control of persons, who ought not to be intrusted with it, and a loss be thereby eventually sustained, such personal representative will be liable to make it good, however unexpected the result, however little likely to arise from the course adopted, and however free such conduct may be from any improper motive.   *   *   *   Necessity, which includes the regular course of business in administering the property, will in equity exonerate the personal representative.   But if without such necessity he be instrumental in giving to the person failing possession of any part of the property, he will be liable, although the person possessing it be a co-executor or a co-administrator.' "   *Clough* v. *Bond,* 3 Mylne & C. 496 ; *Langford* v. *Gascoyne,* 11 Ves. 333 ; *Salway* v. *Salway,* 11 Eng. Ch. 215 ; *Challam* v. *Shippam,* 30 Eng. Ch. 555 ; 2 Williams, Ex'rs, 1648.

In the opinion of the court in *Elliott* v. *Carter,* Judge LEE after reviewing a number of cases says : "Many other cases and opinions of learned judges might be cited tending to the same conclusions; and the fair result of the views which they present and the reasoning they adopt is that, where a trustee has acted in good faith in the exercise of a fair discretion, and in the same manner in which he would probably have acted if the subject had been his own property, and not held in trust, he ought not to be held responsible for any losses accruing in the management of the trust-funds." 9 Gratt. 559.   And then after adverting to the fact, that in Virginia executors and other trustees are allowed compensation, which is not the case in England, and expressing the opinion, that this fact ought not to make the rule more stringent as to the measure of their responsibilities the same judge on page 560 says: "As at present advised therefore I should not feel disposed to extend the responsibilities of trustees beyond the limits by which they would seem to be bounded in the cases to which I have referred; and where they have intended to discharge their duties fairly, I think they should be treated with tenderness, and due caution taken not to hold them liable upon slight or uncertain grounds, lest, by a different policy, men of integrity, and who

would be actuated by the proper views, may be deterred from taking upon themselves an office so necessary to the concerns of life from fear of the anxiety, trouble, and risk which it involves."

It is plainly shown by these views of Judge LEE and other Virginia decisions, that the degree of responsibility of trustees has never been supposed to be any less rigid in Virginia, than it is in England. There are however some Virginia cases, in which the general rule has been relaxed: but they involve the acts of trustees during the late civil war. These cases are anomalous and exceptional and are not to be considered as qualifying the settled law in cases not peculiar in their nature. 2 Minor, Inst. (2d Ed.) 219; *Meyers* v. *Zetelle*, 21 Gratt. 733; *Davis* v. *Harman*, Id. 194. The case at bar involves nothing eccentric or unusual either in the condition of the country or the terms of the trust. In all the essentials it is very similar to the cases of *Matthews* v. *Brise*, 6 Beav. 239, and *Rowland* v. *Witherden*, 3 Mac. & G. 568. In the former it was decided, that, where a trustee had properly invested trust-funds in exchequer bills and then left them in the hands of his broker, by whom they were misappropriated, the trustee was personally responsible. The syllabus in the latter case is as follows:

" Trustees of stock sold it out and committed the proceeds to their solicitor for investment, by whom it was misapplied and lost. Held, that the trustees were liable for a breach of trust, and that the *cestuis que trust* were entitled to relief against both the trustees and the solicitor, and that they might sue either the trustees alone, or the trustees jointly with the solicitor."

The Lord Chancellor in that case says: "The trustees were bound to satisfy themselves in some other way than by the mere assurances of their solicitor, and by the payments made by him as for interest, that the money was really advanced on mortgage. But they did not even require a sight of the mortgage-deed." In both of these cases the fund was properly placed in the hands of a third party, but because the trustees failed to see, that such third party had done his duty by actually making the investment, the trustee was made responsible.

So in the case at bar, if we concede, that Quarrier had the bonds on hand at the time he ageed to sell them to Hughes, that would not relieve Hughes from responsibility, because it was his duty to see, that the title and possession of the bonds had vested in him, or at least that he had acquired the title, and that they had been placed on special deposit in the bank in his name and as his bonds, so that neither Quarrier nor the bank could convert or misapply them without committing a felony. But Hughes wholly failed to do this. He simply paid for the bonds and subsequently collected the interest on them without ever once even inquiring, whether the bonds had been in fact purchased, or whether they had been deposited in the bank as his property. Instead of discharging this plain duty he left the whole matter to Quarrier and trusted to his assurances. There was no necessity for this. The most ordinary prudence would have required the trustee to see, that the investment had been actually made, and that the bonds were in fact in the bank as his property. But it seems, that Quarrier never even represented or gave Hughes any assurance, that the bonds were in the savings institution. All that appears is, that Quarrier agreed to sell to him bonds, which were then alleged to be in New York city. It is true, the record shows, that on the day Hughes paid for the bonds, the savings bank purchased bonds in New York, but there is nothing to show, that this purchase was for Hughes. But it is also shown, that these bonds were on November 2, 1869, sold in New York on the private account of Quarrier. Be this as it may, there is a still more significant fact in the record, which tends strongly to show, that Hughes must have known, that the whole trust-fund had not been invested in United States bonds. The certificate given to him by Lamb, trustee for the trust-fund, dated March 30, 1872, shows on its face, that only a part of said fund—that is, $3,845.45—was represented to be for bonds misappropriated by Quarrier; the other $1,000.00 being, as shown by said certificate, for a balance on a certificate of deposit dated February 15, 1871, held by Hughes in his own right. This latter certificate was for $3,000.00 with a credit thereon for $2,000.00 leaving the said balance of $1,000.00, which was included in Lamb's certificate as part of the trust-

fund. It thus distinctly appears, that the whole of the trust-fund was not in United States bonds at the time the bank failed, and that Hughes must have been cognizant of the fact. While I am not all disposed to affirm, that there was any bad faith or intentional misconduct on the part of Hughes, I can not under all the facts and circumstances of this case and the principles of law before stated discover any ground, upon which he can be relieved from responsibility for the loss of said trust-fund.

The grounds, upon which the responsibility of Hughes has been placed, render it unnecessary to say much in regard to the refusal of the Circuit Court to allow the defendants to re-take the deposition of A. C. Quarrier. The only new fact, which, the defendants claim, they could prove by Quarrier, is, that, at the time he agreed to sell United States bonds to Hughes, the said bonds were in the custody of the Wheeling Savings Institution. It is not pretended, that he would testify, that any bonds were ever delivered to Hughes, or that they had been selected and deposited in the bank for safe-keeping as the property of Hughes. The fact, that they may have been in the bank as the property of the bank or of Quarrier, would not relieve Hughes from responsibility in view of the other fact appearing in the record. The *grava-men* of Hughes's default and the ground, on which he is made responsible, is his failure to have said bonds placed on special deposit as his property and in his name, so that they could not be controlled or used by any person other than himself without the commission of a felony, or at least of something more wrongful than a mere breach of trust and confidence.

It is however insisted for the appellants, that the claim of the plaintiffs is barred by the statute of limitations. On April 4, 1873, Hughes wrote a letter to the plaintiff, Mary Key, addressed to Baltimore, where she resided, in which he stated, that he had invested the trust-fund in United States bonds, and deposited the same in the Wheeling Savings Institution for safe-keeping, and that they had been lost by the failure of the bank in such a manner as to make that bank liable for them; that he had waited to see, what would be realized from the assets of the bank, and had already received two dividends on the said fund, amounting to

$518.46; that there would likely be other dividends on said fund, and he would probably realize something from other securities, which he had obtained from the treasurer of said bank, but how much he could not tell, and that he would inform her of results. It is contended, that this letter was such a repudiation of the trust, as would start the running of the statute of limitations in favor of Hughes, the trustee. It is admitted that in a case of this character, where the relation of the parties is that of trustee and *cestui que trust*, the statute of limitations will not commence to run, until there has been an open denial and repudiation of the trust by the trustee brought home to the *cestui que trust* in such a manner, as will require the latter to act as upon an asserted adverse title. Ang. Lim. § 166; *Cooey* v. *Porter*, 22 W. Va. 120; *Decouche* v. *Savetier*, 3 Johns. Ch'y 190. According to these authorities, it seems to me very clear, that this letter was plainly insufficient to inform Mrs. Key, that Hughes intended to repudiate his trust-relation.

It is further contended, that the laches of the plaintiffs has barred their right to relief in this cause. The record shows, that Hughes continued to pay to the life-tenant the interest upon the trust-fund or an amount nearly or quite equal to such interest up to the time of his death, which did not occur until March, 1886, a few months before this suit was commenced. It is true, there was a difference in the form of the receipts, which he took from Mrs. Key for the payments made prior to 1873, and those he took for payments made thereafter. In the former he is mentioned as "Thomas Hughes, trustee," and in the latter as "Thomas Hughes" simply. But whether the payment was made in the one form or the other, it was a payment in fact and a satisfaction of the only claim, which Mrs. Key had against him. There was no default in the payment, and consequently she had no cause of action, unless she had notice of repudiation of the trust by him. The only pretence of such notice is the letter of April 4, 1873, which we have already considered and hold insufficient for any such purpose. The fact, that the receipts did not describe him as trustee or state, that the payment was on account of interest, did not in the face of the actual payment of the interest even tend to prove a denial of the

trust.   The laches, if there is any involved in this cause, is on the part of Hughes himself in failing to legally notify his *cestuis qui trust* of his repudiation of the trust.   Until he did that, or refused to pay the interest on the trust-fund, neither the life-tenant, Mrs. Key, nor the remainder-men, her children, had any cause of action.   So far as this record discloses, there is not sufficient evidence to warrant any positive statement, that Mr. Hughes ever intended to repudiate this trust, or refuse to pay or account for this trust-fund.   But whatever may have been his undisclosed intention, it is certain he never gave the plaintiffs any legal notice of it; and therefore they are not chargeable with laches for not intuitively discovering it.   As soon as the appellants, as the executors of Hughes, notified the plaintiffs of their repudiation of the trust, and refused to pay the interest thereon, the plaintiffs promptly brought this suit.   It is therefore apparent, that the doctrine of the laches has no application in this suit.

The appellees have made a counter-assignment of error. They claim, that, because the answer of the defendants denies the allegations of the bill, that the payments made by Hughes to Mrs. Key after the loss of the United States bonds were paid as interest on the trust-fund, said payments must be treated as mere gratuities or gifts, and as such it was improper to allow the defendants credit for them, as was done by the decree of the Circuit Court.   From the views, we have taken of facts in this cause in the preceding portions of this opinion, it is clear, that this claim of the appellees can not be sustained.   We have treated all the payments made by the trustee, Hughes, to Mrs. Key both before and after the alleged loss of the trust-fund, as payments on account of the interest on said fund.

For the reasons hereinbefore stated I am of opinion, that the decree of the Circuit Court should be affirmed.

AFFIRMED.